UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**LC U-BAKE, LLC,** an Oregon limited
liability company; **DEMI UBAKE, LLC,** an
Oregon limited liability company; **PAC9
UBAKE, LLC**, an Oregon limited liability
company; **LC WA TAKE-N-BAKE, LLC,** a
Washington limited liability company; and
**PDX TAKE-N-BAKE LLC,** a Washington
limited liability company,

     Plaintiffs,

  v.

**UNITED STATES OF AMERICA**,

     Defendant(s).

Case No. 3:12-cv-0049-KI

OPINION AND ORDER
STAYING AGENCY ACTION

Page 1 - OPINION AND ORDER STAYING AGENCY ACTION

Jeff S. Pitzer
Bryan S. Geon
Pitzer Law
101 SW Main St., Suite 805
Portland, OR 97204

      Attorneys for Plaintiffs

S. Amanda Marshall
United States Attorney
District of Oregon
Sean E. Martin
1000 SW Third Ave., Suite 600
Portland, OR 97204

      Attorneys for Defendant


KING, Judge:

Plaintiffs LC U-Bake, LLC, Demi Ubake, LLC, Pacific Nine Group, LLC, LC WA Take-N-Bake, LLC and DS Ward, LLC challenge the withdrawal decision[1] of the Food and Nutrition Service ("FNS"), a component of the United States Department of Agriculture ("USDA"). Pending before me is a Motion for an Order Staying Agency Action Pending Final Determination by the Court [3]. For the following reasons, I grant the motion.

## BACKGROUND

Plaintiffs filed a First Amended Complaint alleging that they operate cold pizza businesses (i.e. customers pick up partially baked pizza and complete the baking process at home) as franchisees of Little Caesars. The owners of these businesses–through plaintiff LLCs–are the Burgess family, the Akhavi family, and the Ward family, who each operate several

---

[1]I refer to FNS' multiple decisions as a single decision since the withdrawal decisions at issue here are identical.

Page 2 - OPINION AND ORDER STAYING AGENCY ACTION

locations.  Plaintiffs obtained approval to participate in the USDA Supplemental Nutrition

Assistance Program ("SNAP," or Food Stamp Program) so that food stamps could be used to

purchase cold pizza from their businesses.  Cold pizza is defined in the federal regulations as a

"staple food."[2]  Specifically relying on the advice and guidance of the Portland Field Office, a

division of the Western Regional Office of FNS, plaintiffs set up separate LLCs, set up cash

registers at Little Caesars locations just for the take-and-bake pizza businesses, created menus

and signs distinguishing between their take-and-bake and hot pizza businesses, advertised their

cold pizza businesses' participation in SNAP, hired and trained employees, and educated

customers about SNAP.  Plaintiffs complied with a form provided by the Portland Field Office

explaining what was necessary to operate co-located hot and cold pizza businesses.  FNS

approved each plaintiff to participate; FNS approved three locations in August 2010, four in

December 2010, and the remaining locations in February 2011.

On August 22, 2011, after some of the locations had been participating in the program for

a full year, each plaintiff received a  letter from FNS stating that it was "evaluating your

establishment to determine if it is eligible to continue participating" as a SNAP retailer.

Plaintiffs responded to FNS' query about their businesses.  FNS discovered that, when evaluating

each cold and hot pizza business together, cold pizza sales amounted to between 4 and 5 percent

of sales for each of the three Burgess businesses, less than 8 percent for the Akhavis', and 7 to 17

---

[2]SNAP recipients may purchase cold pizza from places such as the grocery store or Papa
Murphy's or Figaro's, which sell only cold pizza.  Plaintiffs' are able to offer cold pizza for
$5.00, "by buying in bulk and operating on razor-thin margins[.]"  Pls.' Mem. in Supp. of App. 1.
In contrast, Figaro's charges $13.95 for the same size pizza, Papa Murphy's charges $9, and
frozen pizzas at the grocery store cost between $6.99 and $7.89.  See McCormick Decl. ¶ 2,
Second. Supp. Burgess Decl. ¶ 2.

percent for the Ward locations. Earlier that same month, the Benefit Redemption Division ("BRD") of FNS had issued a policy memorandum to the FNS Regional Offices about how to apply SNAP eligibility criteria to co-located businesses (the "2011 Policy").

        In October 2011, FNS alerted each plaintiff it was withdrawing authorization to participate in SNAP, referring to existing regulations requiring more than 50 percent of total gross retail sales in staple foods. Plaintiffs appealed and the FNS Administrative Review Officer upheld the decision, although he did note that plaintiffs' "bafflement" over the decision was "understandable." Geon Supp. Decl. Ex. C, at 5.[3] In reaching his decision, the Administrative Review Officer considered the combined nature of the hot (which does not qualify for SNAP) and cold pizza businesses being operated under one roof, the shared kitchens, the fact that the locations themselves appeared geared toward hot food sales, and the shared management, employees, inventory, and ingredients at each location. He also noted that Congress never intended the typical restaurant to be an authorized SNAP retailer. Relying on the statutory language, the regulations and the 2011 Policy issued by FNS after plaintiffs' initial SNAP authorization, he concluded each plaintiff was part of an "establishment" operating as a restaurant. Restaurants are not permitted to accept SNAP payments. He affirmed FNS' withdrawal decision.

        In their First Amended Complaint, plaintiffs seek to stay FNS' withdrawal decision, arguing it is unexplained and arbitrary. They also seek to set it aside on the basis that, under the plain language of the Act and regulations plaintiffs qualify to participate; FNS' decision is a

---

        [3]The pages of the exhibit are not numbered. I refer to the page number of the first decision in Exhibit C since all of the decisions in Exhibit C are identical.

retroactive interpretation of the regulations; FNS is estopped from imposing an after-the-fact

policy change against plaintiffs; the policy change is only permissible via rule-making; FNS

acted arbitrarily and capriciously; and that the agency denied plaintiffs their Fifth Amendment

rights to equal protection and due process since they believe similarly situated pizza business

have maintained authorization to accept SNAP.

Without a hearing and based only on the plaintiffs' submissions, Judge Marco Hernandez

granted a Temporary Restraining Order, finding plaintiffs had established a likelihood of

succeeding on the merits and that they would suffer irreparable and immediate harm if FNS was

not enjoined; as a result of that order, plaintiffs were permitted to continue operating in SNAP.  I

held a hearing on February 9, 2012, taking plaintiffs' motion under advisement at that time.

## LEGAL STANDARDS

Unlike a preliminary injunction, plaintiffs are seeking relief pursuant to the SNAP

regulations.  Those regulations provide that a final agency action will take effect unless the

challenger:  (1) files a complaint for judicial review within 30 days; and (2) makes a timely

application to the court for a stay and, after a hearing, the court grants a stay.  7 C.F.R. § 279.7(a)

and (d).  A stay may be granted if (1) plaintiffs make "a showing that irreparable injury will occur

absent a stay[;]" and (2) plaintiffs are "likely to prevail on the merits of the case."  7 C.F.R.

§ 279.7(d).

Judicial review of an agency decision in this context is reviewed de novo, not under the

arbitrary and capricious standard of review.  7 C.F.R. § 279.7(c).  The party which lost on

administrative review bears the burden of proving, by a preponderance of the evidence, that the

agency's final determination is invalid.  See Fells v. United States, 627 F.3d 1250, 1253 (7th Cir.

2010); Kim v. United States, 121 F.3d 1269, 1272 (9th Cir. 1997).

**DISCUSSION**

I.    Success on the Merits

Plaintiffs must prove by a preponderance of the evidence that FNS' withdrawal of its

prior approval was "invalid" under 7 C.F.R. § 279.7(c).  In their motion, plaintiffs claim FNS'

decision is invalid for the following reasons:  (1) the agency misinterpreted its regulations in

making its withdrawal decision; (2) FNS improperly applied a new interpretation retroactively;

(3) FNS is estopped from redefining the regulations to exclude plaintiffs; and (4) FNS violated

plaintiffs' equal protection rights.

A.    Whether FNS Misinterpreted its Own Regulations

1.    The Statute and Regulations

The statute governing SNAP directs that benefits "shall be used only to purchase food

from retail food stores which have been approved for participation in the supplemental nutrition

assistance program."  7 U.S.C. § 2013(a).  Congress defined a "retail food store" as an

"establishment" that "has over 50 percent of the total sales of the establishment" in staple foods.

7 U.S.C. § 2012(p)(1)(B).  Congress did not define "establishment."

The implementing regulations provide that a "firm" may qualify to accept SNAP

payments if it meets the requirements of a "retail food store."  7 C.F.R. § 278.1.  The regulations

define a "retail food store" to mean:

> An ***establishment*** . . . that sells food for home preparation and consumption . . .,
> and either [complies with Criterion A], or has more than 50 percent of its total
> gross retail sales in staple foods (Criterion B) . . . . ***Entities*** that have more than 50

percent of ***their*** total gross retail sales in hot and/or cold prepared, ready-to-eat foods that are intended for immediate consumption either for carry-out or on-premises consumption, and require no additional preparation, are not eligible for FSP [Food Stamp Program] participation as ***retail food stores*** under §278.1(b)(1) of this chapter.

7 C.F.R. § 271.2 (bold and italicized emphasis added).

Similarly, in considering whether a "firm" qualifies to participate, FNS must consider:

(1) *The nature and extent of the food business conducted by the applicant*–(i) ***Retail food store***.  (A) An ***establishment*** . . . shall normally be considered to have food business of a nature and extent that will effectuate the purposes of the program if it sells food for home preparation and consumption and meets one of the following criteria: [Criterion A]; or have more than 50 percent of the total gross retail sales of the ***establishment*** . . . in staple foods (Criterion B).

7 C.F.R. § 278.1(b) (bold and italicized emphasis added).

The regulations proceed to explain how Criterion B is applied, as follows:

(iii) *Application of Criterion B*:  In order to qualify under this criterion, ***firms*** must have more than 50 percent of ***their*** total gross retail sales in staple food sales.  Total gross retail sales must include all retail sales of a ***firm***, including food and non-food merchandise, as well as services, such as rental fees, professional fees, and entertainment/sports/games income.  However, a fee directly connected to the processing of staple foods, such as raw meat, poultry, or fish by the service provider, may be calculated as staple foods sales under Criterion B.

(iv)  *Ineligible firms.*  ***Firms*** that do not meet the eligibility requirements in this section or that do not effectuate the purpose of the Food Stamp Program shall not be eligible for program participation . . . . [A]uthorized ***retail food stores*** found to be ineligible will be withdrawn from program participation . . . In addition, ***firms*** that are considered to be restaurants, that is, ***firms*** that have more than 50 percent of ***their*** total gross retail sales in hot and/or cold prepared foods not intended for home preparation and consumption, shall not qualify for participation as ***retail food stores*** . . . . This includes ***firms*** that primarily sell prepared foods that are consumed on the premises or sold for carryout . . . .

7 C.F.R. § 278.1(b)(1) (bold and italicized emphasis added).

The regulations require FNS to withdraw SNAP authorization if a "firm" is found to be ineligible or its "continued participation" will not "further the purposes of the program." 7 C.F.R. § 278.1(l)(iii) and (l)(i).

2.    FNS' Interpretation of the Statute and Regulations

The Portland Field Office issued a guidance document entitled "Combination Take-And-Bake/Hot Food Operations."  Burgess Supp. Decl. Ex. 10.  The form, which was not on USDA letterhead, explained that the take-and-bake and hot food "operations" may be co-located, but must be officially separated into two "businesses" in order to comply with the Act.  Id.  Interested applicants were directed to submit to the agency separate state registrations, separate employer identification numbers ("EINs"), and separate business licenses for the hot and cold pizza businesses.  The form also instructed each business to have separate cash registers, separate bank account numbers for take-and-bake sales, separate signs identifying the prices for take-and-bake items, and menus separately identifying the prices for take-and-bake items.

A letter to plaintiffs, printed on USDA letterhead, from the "Officer-in-Charge" at the Portland Field Office, directed plaintiffs to submit an EIN for each business, a business license for each business, and "[a]ny other documents that you have that validate you are operating separate businesses within one location" in order to be evaluated for participation in SNAP. Burgess Supp. Decl. Ex. 8.

Andrea Gold, the director of the BRD, now reports that the Portland Field Office "misapplied" the "definition" of "establishment."  Gold Decl. ¶ 6.  Gold notes the Portland Field Office guidance document was not an official FNS guidance document since it was not "published on letterhead, dated, and otherwise identified as official."  Id.  She does not address

the separate letter, issued on USDA letterhead, from the Officer-in-Charge at the Portland Field Office.

Gold explains that the issue came to her attention in January 2011 when Little Caesars store owners approached the FNS Mountain Plains Regional Office, which in turn sought guidance from BRD. Those store owners never filed applications after Mountain Plains Regional Office staff explained they would not qualify. Between February and May 2011, BRD contacted all of the FNS Regional Offices and asked to be informed of "establishments" with combined hot/cold pizza sales which applied to SNAP. Id. at ¶ 9. It learned of a total of 17 Pizza Patron locations with SNAP approval, from out of the Southwest Regional Office and the Southeast Regional Office, and an additional 15 Pizza Patron applications pending in those regional offices, as well as in the Western Regional Office. The Pizza Patrons "did not meet FNS requirements that more than half of sales be for SNAP-eligible food." Id. FNS withdrew authorizations for all 17 of the Pizza Patron restaurants, and denied all of the pending applications.

Gold explains in her declaration that 7 C.F.R. § 271.2 "defines retail food store as an 'establishment,' which requires a review of an entire business location, including hot food restaurant sales, to determine eligibility to participate in the SNAP as a retail food store." Id. at ¶ 7. She refers to the 2011 Policy the BRD issued in August 2011. In that memorandum, the BRD concludes, based on the language in the Act and regulations, "[a]n *establishment* that includes separate businesses that operate under one roof and have commonalities such as: a single management structure, shared space, logistics, bank accounts, employees and inventory is considered to be a single *entity*. The different businesses cannot be evaluated separately; they are one *establishment* . . . ." Id. at Ex. A, at 1 (bold and italicized emphasis added).

Page 9 - OPINION AND ORDER STAYING AGENCY ACTION

The Administrative Review Officer issued a decision on each appeal, after the agency

issued the 2011 Policy, concluding in part as follows:

> Despite the fact that neither the Act nor its attendant regulations define the
> meaning of the words ***"entity" or "firm,"*** there is no question that LC U-Bake,
> LLC, d/b/a Little Caesars Take-N-Bake [one of the plaintiff's here], is a separate
> and distinct legal ***entity*** from LC PDX, LLC.  In considering whether the two
> ***entities*** are to be considered one ***"firm,"*** however, FNS policy has consistently
> interpreted the word "***firm***" as it appears in the Act, regulations, and policy, as
> applying to ***the retail location, the store, the concern, the applicant retailer, and
> the owner(s)***.

Geon Supp. Decl. Ex. C, at 6 (citing "USDA-FNS, SNAP Benefit Redemption Division Policy

Clarification Memorandum 2010-06") (bold and italicized emphasis added).  Similarly, the

Administrative Review Officer conceded that "establishment" is not defined in the Act or

regulations, but relied on the policy memorandum directing "***establishments*** that include separate

businesses that operate under one roof and have commonalities . . . are considered to be a single

***entity*** for purposes of authorization under Criterion A or B."  Id. at 7 (bold and italicized

emphasis added).

In FNS' memorandum before me, however, FNS suggests that "establishment" should be

interpreted more broadly than "firm" because the regulations use different words, which must be

assigned different meanings.  It further refers to the Black's Law Dictionary for the terms

"establishment" and "firm," concluding that "a 'firm' might be a business entity such as a limited

liability company, [but] it is reasonable to interpret 'establishment' more broadly as a location of

a business."  FNS Resp. 9.

3.      Whether FNS Properly Interpreted the Statute

I am not faced with a question of whether FNS' *regulations*, setting criteria for retail food store participation in SNAP, reasonably interpret the statute. Rather, I am faced with an agency's interpretation of the statute contained in a policy memorandum,[4] and an agency's application of that policy in an adjudication.

The statute and regulations do not define "establishment." Additionally, the regulations introduce the new, undefined terms "firm" and "entities" in the context of evaluating applications for SNAP participation.[5] FNS' 2011 Policy–which is at issue here–also does not define "establishment," "firm," or "entities." Instead, FNS states that it "clarif[ies] the definition of establishment"[6] by informing field offices how to evaluate "separate *entities* within establishments" to determine SNAP eligibility, and it does not grapple with the meaning of "firm" at all. Gold Decl. Ex. A, at 1 (bold and italicized emphasis added).

At least at first glance, and without extensive briefing from the parties on this issue, the statute could support either the plaintiffs' or FNS' interpretation, making it ambiguous.

---

[4]The 2011 Policy also indicates it is an interpretation of the regulations but, for purposes of identifying the level of deference due to the agency's interpretation, I note that the regulation defining "retail food store" as an "establishment" is merely a recitation of the statutory language. Thus, I do not evaluate the agency's interpretation of "establishment" under the more deferential standard for informal agency interpretations of its own regulations under Auer v. Robbins, 519 U.S. 452, 461 (1997).

[5]The statute uses the word "firm" only once, in the context of a provision directed at co-located and wholesale food stores. See 7 U.S.C. § 2018(b)(1). The word "entity" is used to define "benefit issuer" as related to divisions of government, see 7 U.S.C. §§ 2012(e), 2015(b)(4), 2027(a)(3)(D), 2028, and grant recipients, 7 U.S.C. §§ 2020(t), 2034(c).

[6]This choice of words is confusing since there is no definition to clarify.

In Chevron, we held that a court must give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute.  [Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc. 467 U.S. 837], 842-844 [1984].

Here, however, we confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking. Interpretations such as those in opinion letters–like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law–do not warrant Chevron-style deference. Instead, interpretations contained in formats such as opinion letters are "entitled to respect" under our decision in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the "power to persuade," ibid. See [EEOC v.] Arabian American Oil Co., [499 U.S. 244,] 256-258 [1991].

Christensen v. Harris Cnty., 529 U.S. 576, 586-87 (2000) (some internal citations omitted).  In

Skidmore, the Supreme Court directed,

We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

Skidmore, 323 U.S. at 139.

At least at this point, I do not believe FNS is entitled to deference in its interpretation of the term "establishment."  The existing evidence suggests FNS' policy is inconsistent with a previous interpretation of the statute and regulations–an interpretation under which plaintiffs qualified as SNAP retailers.  In addition, the 2011 Policy fails to address the meaning of related, but different, terms in the regulations and its litigation position supports a finding that plaintiffs continue to qualify as SNAP retailers.

Page 12 - OPINION AND ORDER STAYING AGENCY ACTION

The 2011 Policy requires FNS to consider "separate businesses that operate under one roof and have commonalities . . . [as] a single entity.  The different businesses cannot be evaluated separately; they are one establishment[.]"  Gold Decl. Ex. A, at 1.  The existing record, however, suggests that FNS had a different interpretation before issuance of the 2011 Policy.  I draw this conclusion based on the evidence that at least three of the seven FNS Regional Offices previously construed the statute and regulations to consider cold pizza businesses qualified, even when co-located with hot pizza businesses.[7]  The record, then, supports plaintiffs' contention that FNS' previous interpretation–as opposed to just one outlier field office–is inconsistent with its present position.  This factor makes me question the persuasiveness of the 2011 Policy.  See I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 447, n.30 ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.").

Additionally, the 2011 Policy fails to address terms used in the regulations that are central to FNS' evaluation of whether a business qualifies as a SNAP retailer.  For example, the 2011 Policy does not address the meaning of "entity."  Importantly, the regulations define "retail food store" to mean:

---

[7]At the hearing, FNS' counsel suggested that the Pizza Patron businesses were not formed as separate limited liability companies, but there is no evidence in the record on this point.  Furthermore, Gold explained in her declaration that the Pizza Patron businesses "did not meet requirements that more than half of sales be for SNAP-eligible food," the same reason given for plaintiffs' withdrawal, in her summary of events explaining what triggered the need for BRD to provide further instructions to FNS Regional Offices.  Gold Decl. ¶ 9.  Additionally, the Portland Division's instructions to plaintiffs were on USDA letterhead.  I do note, however, that "it is well settled that the government is not bound by the unauthorized acts of its agents."  Watkins v. U.S. Army, 875 F.2d 699, 707 (1989).  Without further evidence, I assume for purposes of this motion, that the Regional Offices were acting pursuant to a broader FNS policy which conflicts with the 2011 Policy.

> An *establishment* . . . that sells food for home preparation and consumption . . ., and either [complies with Criterion A], or has more than 50 percent of its total gross retail sales in staple foods (Criterion B) . . . . *Entities* that have more than 50 percent of their total gross retail sales in hot and/or cold prepared, ready-to-eat foods that are intended for immediate consumption either for carry-out or on-premises consumption, and require no additional preparation, are not eligible for FSP [Food Stamp Program] participation as *retail food stores* under §278.1(b)(1) of this chapter.

7 C.F.R. § 271.2 (bold and italicized emphasis added). The definition of "retail food store" suggests that "entities," as opposed to an establishment, may qualify as SNAP retailers so long as sales of staple foods comprise more than 50 percent of their retail sales. In contrast, the agency's 2011 Policy uses the word "entities" throughout to describe separate businesses operating as part of a larger operation. See Gold Decl. Ex. A, at 1 ("how to evaluate separate *entities* that operate within *establishments*;" "A distinction must be made with respect to when separate *entities* should be evaluated within the *establishment* as a whole, or separately;" and providing "examples for how separate *entities* within *establishments* must be treated"). The Policy explains that "different businesses" operating under one roof with shared commonalities "cannot be evaluated separately; they are one *establishment*[.]" Id. (bold and italicized emphasis added). Confusingly, the Policy also provides that "[a]n *establishment* that includes separate businesses that operate under one roof and have [shared commonalities] is considered to be a single *entity*." Id. (bold and italicized emphasis added). Thus, the Policy seems to anticipate that entities and establishments are different, requiring co-located entities to be evaluated in the aggregate, when the regulation implies that "entities" that have more than 50 percent of "their"–and not the establishment's–gross retail sales in eligible foods qualify as SNAP retailers.

Page 14 - OPINION AND ORDER STAYING AGENCY ACTION

Another example of the 2011 Policy's failure to grapple with important terms is that it does not address the meaning of "firm."  The Administrative Review Officer referred to a SNAP BRD Policy Clarification Memorandum 2010-06, which is not in the record, to find that FNS "has consistently interpreted the word 'firm' as it appears in the Act, regulations, and policy, as applying to the retail location, the store, the concern, the applicant retailer, and the owner(s)." Burgess Supp. Decl. Ex. C, at 6.  However, the implication from FNS' 2011 Policy, by its references to "under the same roof" and "operate under one roof," is that "establishment" also means the "retail location, the store, the concern."  This is consistent with its litigation position–establishment could reasonably be interpreted to mean the "location of a business." FNS Resp. 9.  Importantly, neither the 2011 Policy nor the FNS briefing before me address the fact that such a definition of "establishment" would overlap, at least in part, with what appears to be FNS' interpretation of "firm" as contained in the SNAP BRD Policy Clarification Memorandum 2010-06–when FNS insists different words should carry different meanings. Burgess Supp. Decl. Ex. C, at 6.

Furthermore, a "firm" to mean "the retail location, the store, the concern, the applicant retailer, and the owner(s)" conflicts with FNS' litigation position that "firm" might be a "business entity such as a limited liability company," as opposed to "establishment" which is the "location of a business."  FNS' Resp. 9.  Indeed, if FNS' litigation position is correct, and "firm" means a business such as a limited liability company then, under the SNAP regulations, plaintiffs qualify.  Under the specific regulation "Application of Criterion B," as opposed to the more general "The nature and extent of the food business," the operative word is "firm."  "*[F]irms* must have more than 50 percent of *their* total gross retail sales in staple food sales."  7 C.F.R.

Page 15 - OPINION AND ORDER STAYING AGENCY ACTION

§ 278.1 (b)(1)(iii).  The regulation goes on to provide that "[t]otal gross retail sales must include

all retail sales of a ***firm***, including food and non-food merchandise[.]"  Id. (bold and italicized

emphasis added).  Neither the regulation nor the Policy direct, for example, that "total gross retail

sales" means the sales of all businesses operating under the same roof or even that gross retail

sales are measured against the total gross retail sales of the establishment.  For the same reason,

plaintiffs are not "ineligible firms" or "restaurants" because restaurants are defined to be firms

having more than 50 percent of their total gross retail sales in ineligible food.  7 C.F.R. §

278.1(b)(1)(iv) (bold and italicized emphasis added).  Plaintiffs largely sell eligible foods.

Perhaps anticipating trouble with its interpretation of the qualifying requirements, FNS

also argues that "even if a 'firm' meets Criterion B, that does not guarantee that an establishment

must be authorized in SNAP.  Instead, Congress granted FNS discretion to assess whether a retail

food store's participation 'will effectuate the purposes' of SNAP.  7 U.S.C. § 2018(a)."  FNS

Resp. 10.  While I agree generally with this proposition, and I could see how FNS could make

such a record based on, for example, a concern about SNAP recipient confusion, different

treatment of SNAP recipients from other customers, and perhaps difficulty ensuring compliance

with SNAP requirements, this is not the reason FNS gave for withdrawing plaintiffs'

authorization.  Instead, FNS asserted that each plaintiff was "not eligible to participate in SNAP"

as an "entit[y] that [had] more than 50 percent of [its] total gross retail sales" in foods intended

for immediate consumption and requiring no additional preparation, and as an "[i]neligible firm[]

considered to be [a] restaurant[], that is, [a] firm[] that [had] more than 50 percent of [its] total

gross retail sales" in foods not intended for home preparation and consumption.  Geon Supp.

Decl. Ex. B1-B12; see also Ex. C (Administrative Review Officer summarized, "The withdrawal

Page 16 - OPINION AND ORDER STAYING AGENCY ACTION

determination was based on the Field Office's conclusion that LC's primary nature of business

was that of a restaurant, and that since more than 50 percent of the firm's total gross retail sales

were comprised of [ineligible food], it was not eligible for continued participation").  I do not

accept the *post hoc* rationale of the agency.  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State

Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983) ("courts may not accept . . . counsel's *post hoc*

rationalizations for agency action").

 In short, FNS' construction of "establishment" in its 2011 Policy fails to offer a cohesive

view of the regulatory scheme.  Congress anticipated "establishments" would qualify as retail

food stores to participate in SNAP, and a reasonable definition of "establishment" might mean

the entire business located under one roof.  However, the agency's inconsistent and conflicting

definitions in the applicable policies, regulations, and in litigation give me great pause.  Indeed,

the agency's action–approving and then withdrawing plaintiffs without a coherent

explanation–does nothing to encourage public confidence in, and support of, this or similar

government programs.

 Reading the regulations as written, the terms "entity" and "firm" are not ambiguous and

"clearly appl[y] to each of the plaintiff limited liability companies"[8]–meaning that because each

plaintiff sells more than 50 percent of a staple food, when measured against its own gross retail

---

 [8]Other provisions in the regulations referring to "firm" easily absorb this definition.  E.g.
"Any firm desiring to participate . . . shall file an application;" "An applicant shall provide
sufficient data . . . on the nature and scope of the firm's business;" "In order to qualify under this
criterion, firms shall . . .".  Also, see a treatise's interpretation of the regulation.  53 Am. Jur. 3d
Proof of Facts § 301 (2011) ("For example, the regulations provide that in order to participate in
the Food Stamp Program, the retail food store owner must establish that the required 'staple
foods' comprise more than 50 percent of a ***applicant/vendors'*** total sales.") (bold and italicized
emphasis added).

sales as the regulations require, plaintiffs comply with the SNAP eligibility criterion.  Unless FNS is able to show that its interpretation is entitled to deference, there is a likelihood that plaintiffs will prove by a preponderance of the evidence that FNS' withdrawal of its prior approval was invalid.

      B.      Whether FNS Retroactively Applied a New Interpretation

Plaintiffs additionally argue that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." Landgraf v. USI Film Prods., Inc., 511 U.S. 244, 265, 270 (1994).  Changes to the law are subject to "familiar considerations of fair notice, reasonable reliance, and settled expectations." Id.  Since FNS' withdrawal decision does not comport with these requirements, according to plaintiffs, it should be set aside.  Furthermore, the new interpretation should not be applied retroactively to plaintiffs. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law.").

I disagree with plaintiffs that any decision of FNS was retroactive.  Indeed, the cases upon which they rely support an agency's authority to periodically evaluate the meaning of the statute.  For example, in Pfaff v. U.S. Dep't of Hous. & Urban Dev., 88 F.3d 739, 748 n.4 (9th Cir. 1996), an appeal of an agency enforcement action, the court approved of "case-by-case evolution of statutory standards" in adjudications, but identified factors to consider in determining whether an agency abused its discretion in doing so. See also Seldovia Native Assoc., Inc. v. Lujan, 904 F.2d 1335, 1345 (9th Cir. 1990) (explaining that new interpretation is merely entitled to less deference if it is a departure from prior interpretation).

Page 18 - OPINION AND ORDER STAYING AGENCY ACTION

Here, FNS concluded that plaintiffs' businesses did not meet the standards for SNAP participation, gave them notice, and allowed for an appeal. FNS did not make its decision "retroactive" to the dates the businesses were initially authorized and it did not require the businesses to return FNS funds they had received. Nothing in the regulations precludes FNS from withdrawing a firm's authorization if it believes it no longer meets the criteria, so long as such a decision is based on an accurate and coherent reading of the statute and regulations. However, as I have set forth above, there is strong evidence FNS' decision to withdraw plaintiffs' from SNAP was invalid.

     C.     <u>Whether FNS is Estopped from Applying Redefined Regulations to Plaintiffs</u>

Plaintiffs make the alternative argument that, even if they did not fall within the scope of the regulations, the common law doctrine of estoppel applies to keep FNS from withdrawing its prior approval. Courts are "exceedingly reluctant to grant equitable estoppel against the government." <u>Robertson-Dewar v. Holder</u>, 646 F.3d 226, 229 (5th Cir. 2011). In fact, the Supreme Court in 1990 noted that it had "reversed every finding of estoppel [against the government] that we have reviewed." <u>Office of Pers. Mgmt. v. Richmond</u>, 496 U.S. 414, 422 (1990). In that case, the Supreme Court reiterated the facts of the leading case in estoppel against the government, <u>Federal Crop Insurance Corp. v. Merrill</u>, 332 U.S. 380 (1947), in which the Court declined to require the government to insure a farmer's crop. The farmer had relied on an agent of the Federal Crop Insurance Corporation, who had advised him that his entire crop qualified for insurance, but it was ineligible because part of the farmer's crop was reseeded wheat. The Court "recognized the serious hardship caused by the agent's misinformation," but concluded "not even the temptations of a hard case will provide a basis for ordering recovery

contrary to the terms of the regulation, for to do so would disregard the duty of all courts to observe the conditions defined by Congress for charging the public treasury." <u>Richmond</u>, 496 U.S. at 420 (quoting <u>Merrill</u>, 332 U.S. at 385-86).

The Supreme Court has not foreclosed the possibility of establishing estoppel against the government altogether.  It has suggested that estoppel might be possible in a case "in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." <u>Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.</u>, 467 U.S. 51, 60-61 (1984).

For my purposes, the Ninth Circuit requires satisfaction of a threshold test to establish estoppel against the government.  An injured party must demonstrate "affirmative conduct going beyond mere negligence; even then, estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." <u>Watkins v. U.S. Army</u>, 875 F.2d 699, 707 (9th Cir. 1989) (en banc) (internal quotations and citation omitted).

In interpreting "affirmative" conduct, courts have concluded the following actions do not qualify:  negligence or delay in failing to review a citizenship application filed before the individual was 18, thereby resulting in the individual's deportation (<u>Robertson-Dewar v. Holder</u>, 646 F.3d 226 (5th Cir. 2011)); uninformed reassurance on the part of a school official that employee was entitled to FMLA leave when she was not and she was terminated (<u>Nagle v. Acton-Boxborough Rg'l Sch. Dist.</u>, 576 F.3d 1 (1st Cir. 2009) (describing concerns on the one hand with "honest reliance," and on the other with "enforcement of the law, about the lack of

Page 20 - OPINION AND ORDER STAYING AGENCY ACTION

authority by officials to vary it, and the prospect of spurious lawsuits"); mistake as to parole date (Marsh v. Taylor, 925 F.2d 1131 (9th Cir. 1991) (no estoppel when government reversed decision on parole date)).

Again, I assume, for purposes of this motion, that FNS' previous interpretation of the statute and regulations, under which plaintiffs were approved, was the result of a broader FNS policy–as opposed to just one outlier field office–and conclude that plaintiffs are likely to succeed on this claim. Assuming, as in Watkins, that the FNS employees were acting within their scope of authority, I can discern no difference between Watkins and this situation. In Watkins, the Army repeatedly reenlisted and promoted a solider, with full knowledge of his homosexuality, in violation of its policy that homosexuality was a nonwaivable disqualification for reenlistment. Just as in Watkins, the "agency's conduct went far beyond a mere failure to inform or assist," rather it made affirmative representations "in violation of its own regulations[.]" 875 F.2d at 707.

I also find, based on the limited argument and evidence I have before me, that plaintiffs have shown allowing FNS to proceed with its withdrawal decisions will work a serious injustice on plaintiffs, and the public's interest will not suffer undue damage if FNS is estopped. As discussed further below, plaintiffs have made a case of irreparable harm should the withdrawal decisions not be stayed, and that analysis is just as applicable here in considering the serious injustice to plaintiffs. In addition, as plaintiffs point out, the public will benefit from estopping FNS because SNAP recipients will be able to purchase cold pizza for the lowest price possible.

Further, because the government does not question whether plaintiffs meet the traditional elements of estoppel, I consider them satisfied for purposes of this motion.

Page 21 - OPINION AND ORDER STAYING AGENCY ACTION

Plaintiffs have shown a likelihood of success on this claim.

D.     Whether FNS Violated Plaintiffs' Equal Protection Rights

Plaintiffs assert that other similarly situated pizza businesses–like Figaro's–have been allowed to continue in SNAP.  Plaintiffs concede that review is limited to "rational basis" review–that is the agency's actions will be upheld if they are rationally related to a legitimate government interest.  Bull v. Massanari, 254 F.3d 817, 823 (9th Cir. 2001).  Plaintiffs assert the government cannot articulate a rational basis for treating Figaro's different from them.

The government first notes that courts have rejected equal protection challenges brought by retail food stores against FNS.  Retail business interests are only indirect beneficiaries of SNAP.  Kentucky Fried Chicken of Cleveland, Inc. v. United States, 449 F.2d 255, 257 (5th Cir. 1971); Capricorn Coffees, Inc. v. Butz, 432 F. Supp. 917, 919-20 (N.D. Cal. 1977).  Further, the government has provided a declaration from Figaro's Pizza owner Rick Glenn in which he disputes that his business is set up like plaintiffs'.  Plaintiffs are unable to rebut his testimony that substantially more than 50 percent of his gross retails sales are made up of cold pizza.

Based on the evidence supplied by FNS, I cannot find that plaintiffs are likely to succeed on their equal protection claim.

II.     Whether Plaintiffs Will Be Irreparably Injured

Plaintiffs assert irreparable harm based on the following factors:

- •     plaintiffs would have to terminate 20 employees

- •     customer base would collapse

- •     wasted tens of thousands of dollars in advertising, equipment and restructuring businesses

Page 22 - OPINION AND ORDER STAYING AGENCY ACTION

- customers would go to competitors

- goodwill would be destroyed

- inference that plaintiffs have done something wrong to be expelled from SNAP

- constitutional violation constitutes irreparable harm

Economic harm is normally insufficient to support the irreparable harm prong for a preliminary injunction. The parties here, however, dispute whether a SNAP regulation precludes damages from the Secretary for the value of any sales lost during the "disqualification period." If they are precluded from obtaining damages from the Secretary, plaintiffs suggest that their economic harm could constitute irreparable injury. The government has assured me, however, that the regulation plaintiffs cite, 7 C.F.R. § 279.7(d), applies only to disqualification and not to withdrawal actions. As a result, according to FNS, the economic harm plaintiffs assert can be recoverable from the government in a contract-based action.

Setting aside the components of plaintiffs' harm that can be reimbursed by money, then, I am left with: (1) an alleged constitutional violation; (2) loss of goodwill and reputation; (3) and the harm alleged to employees.

Plaintiffs are right that an alleged constitutional violation alone may support a finding of irreparable harm. See Monterey Mech. Co. v. Wilson, 125 F.3d 702, 715 (9th Cir. 1997). The problem is that the evidence of a constitutional violation is lacking. Similarly, any harm to employees is not a harm to the business, and higher unemployment costs is a classic economic harm that can be remedied with damages.

I give more credence to plaintiffs' contention that they will lose goodwill and that their reputation will be negatively affected should the withdrawal decisions take effect. For example,

Page 23 - OPINION AND ORDER STAYING AGENCY ACTION

Jeff Burgess testified in his declaration that he listened to Lars Larson, who "made disparaging comments about our business after learning that the government was seeking to terminate us from the program." Second Supp. Burgess Decl. ¶ 4. Plaintiffs point, too, to a Willamette Week article which explained that the withdrawal decision came "after inspections found that only about 5 percent of one pizza shop's revenues came from selling cold pizza, and that the operations shared a kitchen" when, in fact, plaintiffs set up their cold pizza businesses with the express guidance and approval of FNS and were not required to measure their cold pizza sales against the location's total sales. Id., at Ex. B, at 1.

Plaintiffs also argue that their businesses have built up goodwill over five to eight years, not just the 12 to 18 months they have been selling cold pizza. While assessing the length of goodwill accumulation using the hot pizza business as the marker reinforces the notion that plaintiffs actually see themselves as a hot pizza restaurant, I find it likely that the goodwill of hot pizza customers will be eroded by the government's withdrawal of plaintiffs from SNAP. Plaintiffs are right to be concerned about how their forced withdrawal from SNAP will look to the public, particularly when similar enforcement actions are typically limited to SNAP retailers who violate regulations or misuse SNAP funds, and when FNS continues to permit other pizza businesses to receive SNAP funds for cold pizzas. Furthermore, although the cold pizza business makes up only 5-7% of the overall on-premises sales, it looks like about 85-93% of the cold pizzas are purchased with SNAP benefits. Gold Decl. Ex. F, at 4. Thus, even if the hot pizza businesses would be unaffected by the SNAP authorization withdrawal, the cold pizza businesses will be drastically affected. See Akhavi Decl. ¶ 6 ("the impact on my business will be significant and irreparable"); Ward Decl. ¶ 6 (same); Burgess Decl. ¶ 6 (same).

Page 24 - OPINION AND ORDER STAYING AGENCY ACTION

In sum, I find plaintiffs have made a "sufficient showing" of a threat to business to rebut the argument that any such loss is compensable in damages.  Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985) (without a "sufficient showing" of a threat to a business, "any loss in revenue" is compensable in damages); Stuhlbarg Int'l. Sales Co., Inc. v. John D. Brush and Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001) ("threatened loss of prospective customers or goodwill" supported preliminary injunction); Rent-a-Center, Inc. v. Canyon Television & Appliance, 944 F.2d 597, 603 (9th Cir. 1991).

## CONCLUSION

For the foregoing reasons, the Motion for an Order Staying Agency Action Pending Final Determination by the Court [3] is granted.


IT IS SO ORDERED.

DATED this _____20th_____ day of April, 2012.


_ /s/ Garr M. King_____
Garr M. King
United States District Judge